JUL 2 4 2008

PLAINTIFF DEMANDS
TRIAL BY JURY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GARY L. TATUM, individually,

Plaintiff,

v.

MARY CHRISTINA OBERG, in her individual and
    professional capacity,
FORD, OBERG, MANION and HOUCK, PC.,
C. MICHAEL BUDLONG, in his individual and
    professional capacity,
BUDLONG & BARRETT, LLC,
DONALD J. HIEBEL, in his individual and
    professional capacity,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
) July 23, 2008

*3:08cv 1251 (JCH)*

## PRELIMINARY STATEMENT

Gary Tatum of Texas in his capacity as an individual and on behalf of other similarly situated persons hereby asserts the following claims against the defendants in the above-entitled action:

(1) FRAUD (AGAINST OBERG),

(2) FRAUD (AGAINST FORD, OBERG, MANION, & HOUCK, PC.),

(3) BREACH OF CONTRACT (AGAINST OBERG),

(4) BREACH OF CONTRACT (AGAINST FORD, OBERG, MANION, & HOUCK, PC.),

(5) MALPRACTICE/NEGLIGENCE (AGAINST OBERG),

(6) MALPRACTICE/NEGLIGENCE (AGAINST FORD, OBERG, MANION, & HOUCK, PC.),

(7) CUTPA VIOLATION (AGAINST FORD, OBERG, MANION, & HOUCK, PC.),

(8) CONSPIRACY TO COMMIT FRAUD (AGAINST ALL DEFENDANTS),

(9) OBSTRUCTION OF JUSTICE (AGAINST ALL DEFENDANTS),

(10) CONCEALMENT OF EVIDENCE (AGAINST ALL DEFENDANTS EXCEPT HIEBEL)

(11) CONCEALMENT OF EVIDENCE (AGAINST HIEBEL)

(12) CIVIL RICO (AGAINST ALL DEFENDANTS),

(13) VIOLATION OF 42 U.S.C. 1983 (AGAINST HIEBEL),

(14) CONSPIRACY TO VIOLATE CIVIL RIGHTS (AGAINST ALL DEFENDANTS),

(15) VIOLATION OF CONNECTICUT CONSTITUTION, ARTICLE 1, SECTION 20. (AGAINST ALL DEFENDANTS),

(16) WRONGFUL INTERFERENCE WITH PARENTAL RIGHTS (AGAINST ALL DEFENDANTS)

Plaintiff further claims that the Child Support Production Incentives Act of 1998 (42 U.S.C. § 658a, "Incentive Payments to States") is unconstitutional.

Plaintiff Gary L. Tatum, ("Tatum"), alleges as follows:

## PARTIES

1.      Plaintiff Tatum is a citizen of the State of Texas and presently resides in Georgetown, Texas 78626. Tatum resided in Connecticut during the period between September 6, 2001 and June 4, 2004, primarily at 31 Pinecrest Ridge, Woodstock, Connecticut 06251.

2.      Defendant Mary Christina Oberg is a citizen of the State of Connecticut and resides in Marlborough, Connecticut 06447. Defendant Oberg is a partner in the law firm of Ford, Oberg, Manion & Houck, P.C. At all relevant times, defendant Oberg acted as the agent, and/or employee of defendant Ford, Oberg, Manion & Houck, P.C., and/or in the alternative, acted on her own behalf, and was acting within the course and scope of the authority of defendant Ford, Oberg, Manion & Houck, P.C.

3.      Defendant Ford, Oberg, Manion & Houck, P.C. is a corporation created under the laws of the State of Connecticut that is engaged in the trade or commerce of advertising and/or offering to sell or selling legal services and has its principal place of business at 220 Hartford Turnpike, Vernon, Connecticut 06066.

4.      Defendant C. Michael Budlong is a citizen of the State of Connecticut and resides in Bloomfield, Connecticut 06002. Defendant Budlong is the principal in the law firm of Budlong & Barrett, LLC. At all relevant times, defendant Budlong acted as the agent, and/or employee of defendant Budlong & Barrett, LLC, and/or in the alternative, acted on his own behalf, and was acting within the course and scope of the authority of defendant Budlong & Barrett, LLC.

5.      Defendant Budlong & Barrett, LLC is a limited liability corporation created under the laws of the State of Connecticut and has its principal place of business at 93 Oak Street, Hartford, Connecticut 06106.

6.      Defendant Donald J. Hiebel, PhD is a citizen of the State of Connecticut. Defendant Hiebel is a psychologist in private practice and has his principal place of business at Roeder & Polansky Family & Child Associates, 300 Plaza Middlesex, Middletown, Connecticut 06457. Upon information and belief, throughout the events that are described below, defendant Hiebel acted under color of state law in the production of his psychological evaluation, which was a task traditionally delegated to the state.

## JURISDICTION AND VENUE

7.      The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

8.      This Court has jurisdiction of this action under 28 U.S.C. § 1332 in that there is diversity of citizenship.

9.     This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, and in matters of violations of Constitutional rights, including but not limited to 42 U.S.C. §§ 1983 and 1985. Declaratory and injunctive relief is proper pursuant to 28 U.S.C. § 2201.

11.     Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1) and (c), and 18 U.S.C. § 1965 (a) in that the defendants are individuals and corporations subject to personal jurisdiction here and thus reside here, and under 1391(a)(2) in that a substantial part of the events giving rise to the claim occurred here.

## FACTUAL BACKGROUND

12.     On February 12, 2002, plaintiff Tatum, retained the defendant firm Ford, Oberg, Manion, & Houck, to provide legal representation for the plaintiff for the purpose of handling the plaintiff's dissolution of marriage and property division in the matter of Murphy v. Tatum, entered into the docket as civil family number TTD-FA-01-0077799-S in the Superior Court at Rockville, Connecticut. In consideration thereof, Plaintiff paid the sum of $4,500 to defendant firm Ford, Oberg, Manion, & Houck, P.C. as a retainer. Defendant Mary Christina (Tina) Oberg was assigned to the plaintiff's case.

13.     Defendant Budlong of defendant firm Budlong & Barrett, LLC represented Plaintiff's former spouse, Kathleen J. Murphy, PhD, beginning sometime in or about March, 2004.

14.     Between February 2002 and April 2004, defendant Oberg made various requests for production of financial information from Dr. Murphy, noting in each case that such requests were in accordance with provisions of the Connecticut Practice Book.

15.     Defendant Oberg explained to Plaintiff that the financial information collected would be used to determine an equitable distribution of marital assets and to determine the amount of any applicable child support order.

16.     In a memo dated May 19, 2003, defendant Oberg selected defendant Dr. Hiebel as the court-appointed psychologist for the purpose of conducting a psychological evaluation of parents Tatum and Murphy.

17.     Plaintiff stated concerns to defendant Oberg that he had learned that states receive a percentage of child support collections from the federal government, and that this money might unduly influence courts to decide custody based on how much money the state would collect on child support payments, rather than solely on the best interests of the children. Defendant Oberg acknowledged Plaintiff's concerns about income in a memo dated October 21, 2003, in which she stated that "judges do and will consider it in the custody determination."

18.     Plaintiff provided defendant Dr. Hiebel with releases to contact medical providers, and other written information to use in his evaluation, including Plaintiff's personal statement that finances should be irrelevant to a custody decision, and including a statement that Dr. Murphy had previously made to the Plaintiff that she had suffered abuse as a child by members of the household where she and the children were now living.

19.     During a joint session where defendant Hiebel and both parents (Tatum and Murphy) were all in attendance, Dr. Murphy stated twice that she did not believe in joint custody. Plaintiff observed that Dr. Hiebel started, but decided not to record her statement in his notes.

20.     Dr. Hiebel later stated that he would administer the MMPI psychological test to both parents (Tatum and Murphy). Plaintiff objected that Dr. Murphy knew that test very well from her own work as a psychologist, and that it would therefore not give valid or reliable results when given to her. Dr. Murphy acknowledged to Dr. Hiebel that the subject of her PhD dissertation involved the construction of the MMPI test, and that she used the MMPI test in her own private practice.

21.     Plaintiff paid the sum of $3,000 to defendant Hiebel for plaintiff's share of the cost of the psychological evaluation.

22.     Defendant Hiebel completed the evaluation on or about November 3, 2003. The report recommended Dr. Murphy as primary custodian of the children. Plaintiff immediately objected to defendant Dr. Hiebel by phone, and to defendant Oberg by email that his report was overtly biased against Plaintiff Tatum for several reasons, specifically citing the omission of any mention of the history of abuse at the household where the children were staying that would have been corroborated by the Texas psychologist that was available to Dr. Hiebel, the complete omission of Plaintiff's injury that would have been corroborated by the physicians that were available to Dr. Hiebel, and the omission of any concerns with the accuracy or reliability of Dr. Murphy's MMPI test results. The report also omitted Dr. Murphy's admission that she did not believe in joint custody. Defendant Hiebel subsequently corrected only errors in names in his report.

23.     Plaintiff expressed concerns to defendant Oberg that since he had been unable to secure an income thus far, without an adequate financial settlement, he would no longer be able to afford any rent, and he would have to return to Texas to live with relatives, while the court would require him to leave his children in Connecticut.

24.     Plaintiff noted to defendant Oberg in an email dated April 4, 2004 that Dr. Murphy had still not provided sufficient financial information for an adequate property division.

25.     Defendant Oberg responded via email dated April 20, 2004 that plaintiff should be content with the financial information already received, stating "If you were to discover down the line that she had other assets not disclosed, you could seek to reopen the judgment for fraud." Based on this reassurance, and the clause on the property division statement that stated Plaintiff Tatum would receive "all other property" not specifically identified by Dr. Murphy, Plaintiff agreed to the property settlement.

26.    Plaintiff expressed concerns to defendant Oberg that Dr. Murphy would not abide by the custody agreement and he would not have sufficient funds to challenge any violation by Dr. Murphy. Defendant Oberg added a clause to the custody portion of the agreement stating that a party who violated the custody provisions would be obligated to pay the attorney fees of the other party. This reassurance was a significant factor in Plaintiff's willingness to accept the custody agreement.

27.    Plaintiff Tatum and ex-spouse Murphy divorced by agreement on April 22, 2004. The agreement was drafted by defendant Oberg and contains a custody schedule provision should the plaintiff relocate to Texas. The agreement also contains a non-disclosure clause relative to the contents of the psychological evaluation prepared by defendant Hiebel.

28.    On May 24, 2004, subsequent to the April 22, 2004 divorce date, plaintiff contacted defendant Oberg that while separating property belonging to Dr. Murphy in preparation for his move to Texas, he had discovered receipts for several thousand dollars worth of bonds that Dr. Murphy had purchased but may not have disclosed on her financial affidavit.

29.    Plaintiff moved to Texas on June 4, 2004, at a cost of $3,658.64, including the cost of local labor to move furniture and other items into a storage unit in Putnam, Connecticut, since Plaintiff could not locate an affordable moving truck large enough to move all the items to Texas at that time. Plaintiff was subsequently unable to sell the items or pay for their complete retrieval for several months, until August 2007. The total amount Plaintiff paid for storage in Connecticut was $3,603.22.

30.    On June 18, 2004, plaintiff contacted defendant Oberg from Texas that he had performed an internet asset search that revealed Dr. Murphy had purchased real estate that she had not disclosed on her financial affidavits. Records showed that the real estate was purchased in 2002, during the pendency of the divorce.

31.    Defendant Oberg filed a motion to reopen the property judgment on July 9, 2004, and stated in an email that she could handle the initial motion to reopen hearing on August 9, 2004 without need for the Plaintiff's attendance. Defendant Oberg subsequently informed Plaintiff that the only issues that would be relevant at the upcoming full hearing would be the assets that Plaintiff had discovered.

32.    Defendant Oberg drafted a subpoena duces tecum dated July 13, 2004 and emailed a copy of it to the Plaintiff. The subpoena requested Dr. Murphy's 2003 federal income tax return, among other information.  Plaintiff replied via email dated July 22, 2004 that the subpoena should have included a request for Dr. Murphy's 2002 income tax return since that was the year when the real estate was purchased. Defendant Oberg replied via email dated August 4, 2004 that she intended to only request Dr. Murphy's 2003 income tax return.

33.    During the Motion to Reopen hearing that began on October 22, 2004, evidence was entered that the value of the unreported real estate was $47,000 and the face value of the unreported bonds that had been discovered thus far was approximately $45,000.

34.    Defendant Oberg did not ask Dr. Murphy while under oath if she had concealed any other financial assets in addition to the bonds and real estate holdings. Defendant Oberg also did not mention the clause in the original property settlement that the Plaintiff was to receive "all other property" that had not been specifically identified by Dr. Murphy. A finding of fraud was issued against Dr. Murphy, but the motion to reopen the property judgment was denied. Plaintiff Tatum was only awarded $500 in attorney fees.

35.    Plaintiff appealed the denial of the Motion to Reopen, and retained the firm of Horton, Shields, and Knox on February 7, 2005. Plaintiff made an early withdrawal from his IRA to pay the $20,000 retainer. Attorney Dan Krisch was assigned to handle the appeal, entered into the docket as case # AC 26256, filed on February 8, 2005.

36.    Dr. Murphy subsequently refused to let the children be with Plaintiff during Spring Break, or travel to Texas for the summer of 2005 as the custody agreement specified, whereupon plaintiff contacted defendant Oberg to file appropriate motions for contempt and modification of custody. Defendant Oberg informed Plaintiff that, despite the divorce agreement's provision that violators of the custody agreement would be responsible for the opposing party's attorney fees, Plaintiff would have to pay an additional retainer for her to initiate such actions, and stated that the Plaintiff should handle that action pro se. Defendant Oberg assisted Plaintiff in the preparation of the pro se appearance motion form filed on July 25, 2005.

37.    During the course of representation by defendant Oberg, Plaintiff paid the defendant firm Ford, Oberg, Manion and Houck, PC., the sum of $17,402.50.

38.    Plaintiff at this time studied the Connecticut practice book and learned that it provides for the preceding 3 years of federal and state income tax returns to be made available upon request. Plaintiff then examined all the requests for production that he had in his possession that had been prepared by defendant Oberg and discovered that they had all omitted, at a minimum, Dr. Murphy's 2002 state and federal income tax returns. The production request dated February 6, 2003 omitted Dr. Murphy's 2002 income tax returns, and the subpoena duces tecum dated January 21, 2004 omitted both the 2002 and 2003 income tax returns.

39.    Plaintiff prepared a request for production that specifically asked for Dr. Murphy's 2002 and 2003 state and federal income tax returns, among other financial information from that time period, as provided by Connecticut Practice Book section 25-32, and submitted the request to the office of defendant Budlong & Barrett, LLC prior to the hearing on motions for child support and modification of custody. The information requested was not provided by defendant Budlong or defendant Budlong & Barrett, LLC.

40.    At the hearing on October 22, 2005, plaintiff filed a Motion to Compel Discovery relative to Plaintiff's request for production of Dr. Murphy's 2002 and 2003 financial information. Defendant Budlong asked Plaintiff under oath for Plaintiff's income for each job Plaintiff held since graduating college in 1979. Plaintiff Tatum complied, including Plaintiff's maximum income in 2001 of approximately $60,000 per year. Defendant Budlong then objected when Plaintiff asked his client (Dr. Murphy) under oath about her income for the years 2002 and 2003. The objection was overruled, and Dr. Murphy stated that her 2002 income was approximately $138,000 and that her 2003 income was approximately $78,000.

41.    Judge Swords was prepared to enter a child support order against plaintiff Tatum, prior to ruling on the motions for modification, even though the plaintiff had no income and no means to pay any child support. Defendant Budlong then offered to defer the child support issue if plaintiff would settle the appeal now.

42.    Plaintiff feared incarceration if a child support order were entered that he could not pay, and therefore settled the appeal for $12,500 and a one-year deferral of the issue of child support. The settlement agreement was dated October 17, 2005.

43.    By defendant Budlong's actions and Dr. Murphy's testimony, plaintiff subsequently realized that defendants Oberg and Budlong had conspired to conceal Dr. Murphy's 2002 and 2003 income tax returns and other financial information because Dr. Murphy's income during each of those two years was greater than the Plaintiff's maximum income in 2001. Defendants Oberg and Budlong believed that the courts would prefer to impose child support orders on the higher-income parent, in order to maximize the dollar amount of child support orders, which would also maximize federal payments to the State of Connecticut under the 1998 Child Support Performance and Incentive Act (CSPIA). By concealing Dr. Murphy's higher 2002 and 2003 incomes from the Plaintiff and the court, defendants Oberg

and Budlong therefore intended to secretly assist Dr. Murphy in obtaining primary custody of the children and thereby insure that the Plaintiff would be the parent subjected to a child support obligation.

44.     Plaintiff also realized around this time that Dr. Murphy purchased the real estate in 2002 and did not disclose the asset on her financial affidavit because she was confident she would never be asked to disclose her 2002 and 2003 income tax returns or other financial information that might reveal its existence.

45.     Plaintiff also realized that defendant Dr. Hiebel was involved in the conspiracy against the Plaintiff, in order to insure that his biased recommendation would be consistent with the misleading financial information that defendants Oberg and Budlong would make available to the court.

46.     After return of the unused retainer, the net amount that Plaintiff paid the firm of Horton, Shields and Knox was $13,367.51. Plaintiff also incurred travel expenses to attend the settlement hearing in the amount of $598.70.

47.     Plaintiff filed a small claims action against defendant Dr. Hiebel in October 2006, entered into the docket in Middletown, Connecticut as case number SCAM-112317, alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA) relative to the implied business agreement to provide an unbiased psychological evaluation. Defendant Hiebel was represented by attorney Robert Fried.

48.     Plaintiff submitted a request for production dated May 18, 2007, that requested several documents, including Dr. Hiebel's notes from his evaluation. Defendant Hiebel did not provide the majority of the documents requested, and filed a Notice of Objections to the Request for Production, claiming that the information was privileged, including his notes from the meetings where both parents were present.

49.    Plaintiff notifed attorney Fried by email on June 3, 2007 that both parents had signed Privacy Consent releases, and that there were two exceptions to the general doctor-patient privileged communications, one regarding court-ordered evaluations, and the other regarding proceedings against a psychotherapist, that would apply in this situation. Defendant Hiebel still did not provide the information requested.

50.    Defendant Hiebel submitted a Motion to Dismiss on the hearing date of August 6, 2007, claiming absolute immunity from prosecution for fraud on the grounds that he prepared his evaluation under color of state law. On that basis, the court dismissed the case on November 13, 2007. Plaintiff's motion to reconsider was denied on April 17, 2008.

## CLASS ACTION ALLEGATIONS

51.    With respect to Plaintiff's claim for forward-looking injuctive and declaratory relief, Plaintiff seeks to represent a class pursuant to Rule 23(b)(2), of all individuals who bring disputes before any court or government agency where child support is an issue or potential issue. As demonstrated by defendants' unconstitutional actions, members of this class are in danger of having custody of their children unconstitutionally taken from them due to a state's desire for federal funds. Members of this class are in danger of unfair treatment by government agencies and representatives of government agencies if a member's income or earning capacity happens to be greater than the income or earning capacity of an alternate custodian of the minor children.

52.    The class is sufficiently numerous that joinder of all members is impractical.

53.    There are questions of law common to the class, such as whether the policy of depriving parents of custody of their children in the absence of imminent harm violates the Constitution.

54.    Plaintiff claims are typical of those of the class he seeks to represent, and he is an adequate representative of that class.

55.    Defendants have acted and/or threaten to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief.

**COUNT ONE: FRAUD (Against Oberg)**

56.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 55 as though fully set forth herein.

57.    A business relationship existed between defendant Oberg and Plaintiff Tatum.

58.    Defendant Oberg deceived the Plaintiff into believing that the settlement agreement's penalty clause would provide for legal representation for the Plaintiff at minimal cost if Dr. Murphy violated the custody agreement again, when in fact the defendant knew that essentially all attorneys, including herself, would require a significant retainer before initiating any legal action on behalf of the Plaintiff.

59.    Defendant Oberg deceived the plaintiff into believing she was representing the Plaintiff in the matter of custody of the children, when in fact she was secretly aiding Dr. Murphy in obtaining primary custody of the children, by repeatedly and intentionally declining to ask for Dr. Murphy's 2002 and 2003 income tax returns and other financial information, to make it appear to the court that the Plaintiff had the greater earning capacity.

60.    Defendant Oberg deceived Plaintiff into believing she had obtained a fair division of marital property for the Plaintiff, when in fact she was secretly aiding Dr. Murphy in the concealment of income and financial assets from the Plaintiff.

61.    Defendant Oberg deceived Plaintiff into signing the settlement agreement with assurances that he could later recover any assets that Dr. Murphy may have concealed, when in fact she knew that such recovery would not be assured, and she continued to conceal Dr. Murphy's 2002 income tax and other financial information after Plaintiff discovered evidence of Dr. Murphy's fraud.

62.     As a result of the deception and fraud of defendant Oberg, Plaintiff Tatum has been deprived of meaningful contact with his children, and has suffered damages in an amount to be determined at trial.

**COUNT TWO: FRAUD (Against Ford, Oberg, Manion, & Houck, PC.)**

63.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 62 as though fully set forth herein.

64.     A business contract existed between plaintiff Tatum and defendant Ford, Oberg, Manion, & Houck, PC. that essentially provided that the defendant would represent the plaintiff to the exclusion of the party adverse to the Plaintiff.

65.     Plaintiff relied on representations of defendant Ford, Oberg, Manion, & Houck, PC. that he would receive competent, professional, and fair legal representation.

66.     Defendant Ford, Oberg, Manion, & Houck, PC. knowingly prepared and/or concealed documents, and/or assisted in the preparation and/or concealment of documents, for the purpose of deceiving Plaintiff into believing he was receiving competent representation from the defendant, when in fact the documents were created and/or concealed to assist Dr. Murphy in the concealment of income and financial assets from the Plaintiff, with the intent to deprive Plaintiff of custody of his children and deprive Plaintiff of his rightful share of marital assets.

67.     After Plaintiff discovered evidence of Dr. Murphy's fraud, defendant Ford, Oberg, Manion, & Houck, PC. knowingly continued to prepare requests for production that were intended to conceal Dr. Murphy's 2002 financial information from the Plaintiff with the intent to harm the Plaintiff in subsequent legal actions.

68.     As a result of the deception and fraud of defendant Ford, Oberg, Manion, & Houck, PC., Plaintiff Tatum has been deprived of meaningful contact with his children, and has suffered damages in an amount to be determined at trial.

**COUNT THREE: BREACH OF CONTRACT (Against Oberg)**

69.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 68 as though fully set forth herein.

70.    An implied agreement existed between plaintiff Tatum and defendant Oberg that the defendant would represent plaintiff to the exclusion of the adverse party.

71.    Defendant Oberg breached the implied agreement between attorney and client to provide legal representation for the benefit of the Plaintiff.

72.    As a result of the breach of contract, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT FOUR: BREACH OF CONTRACT (Against Ford, Oberg, Manion, & Houck, PC.)**

73.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 72 as though fully set forth herein.

74.    A contract existed between plaintiff Tatum and defendant Ford, Oberg, Manion, & Houck, PC. that essentially provided that the defendant would represent the plaintiff to the exclusion of the adverse party.

75.    Defendant Ford, Oberg, Manion, & Houck, PC. breached the agreement to provide legal representation solely to the Plaintiff.

76.    Defendant Ford, Oberg, Manion, & Houck, PC. breached the implied agreement between law firm and client to provide legal representation solely to the Plaintiff.

77.    As a result of the breach of contract and breach of the implied agreement, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT FIVE: MALPRACTICE (Against Oberg)**

78.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 77 as though fully set forth herein.

79.     An attorney/client relationship existed between defendant Oberg and Plaintiff Tatum that imposed a duty upon defendant Oberg to solely represent the Plaintiff.

80.     Defendant Oberg breached her fiduciary duty to solely represent the Plaintiff to the exclusion of the adverse party.

81.     Defendant Oberg was negligent in failing to request 2002 and 2003 state and federal income tax returns and other financial information from Dr. Murphy as provided by the Connecticut Practice Book.

82.     Defendant Oberg was negligent in obtaining sufficient financial information from Dr. Murphy regarding the ownership of other assets.

83.     As a result of the malpractice of defendant Oberg, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT SIX: MALPRACTICE (Against Ford, Oberg, Manion, & Houck, PC.)**

84.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 83 as though fully set forth herein.

85.     An attorney/client relationship existed between defendant Ford, Oberg, Manion, & Houck, PC. and Plaintiff Tatum that imposed a fiduciary duty upon the defendant to solely represent the Plaintiff.

86.     Defendant Ford, Oberg, Manion, & Houck, PC. breached the duty to solely represent the Plaintiff to the exclusion of the adverse party.

87.     Defendant Ford, Oberg, Manion, & Houck, PC. was negligent in failing to request sufficient financial information from Dr. Murphy as provided by the Connecticut Practice Book.

88.     Defendant Ford, Oberg, Manion, & Houck, PC. was negligent in the monitoring of the activities of defendant Oberg and the employees under her direction.

89.    As result of the malpractice of defendant Ford, Oberg, Manion and Houck, PC., Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT SEVEN: VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT
## (Against Ford, Oberg, Manion, & Houck, PC.)

90.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 89 as though fully set forth herein.

91.    Defendant Ford, Oberg, Manion, & Houck, PC. accepted payments from Plaintiff for the stated and implied purpose of obtaining an equitable financial settlement, while unfairly acting with reckless indifference to the rights of the Plaintiff by intentionally and repeatedly concealing evidence for the purpose of preventing the Plaintiff from obtaining an equitable financial settlement.

92.    Defendant Ford, Oberg, Manion, & Houck, PC deceived Plaintiff into believing his custodial rights were being protected by the settlement agreement that was produced by the defendant, when in fact the defendant knew the agreement would be ineffective in that effort if the Plaintiff did not have significant financial means available.

93.    Plaintiff was denied his rightful share of marital assets, which forced Plaintiff to incur moving expenses to leave Connecticut, and incur the expenses of additional legal actions that would not have been necessary except for Defendant's intentional and continued concealment of evidence regarding the true amount of marital assets available.

## COUNT EIGHT: CONSPIRACY TO COMMIT FRAUD (Against all defendants)

94.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 93 as though fully set forth herein.

95.    Defendant Oberg and defendant Ford, Oberg, Manion, & Houck, PC. repeatedly declined to ask for Dr. Murphy's 2002 and 2003 income tax returns, because the defendants already knew that the income amounts in each of those two years were greater

than the Plaintiff's highest income year in 2001. The only source of knowledge of Dr. Murphy's sensitive income tax return information was defendant Budlong and the defendant firm of Budlong & Barrett, LLC.

96.    Dr. Murphy purchased the hidden real estate in 2002 knowing that she would not be asked for her 2002 or 2003 income tax returns or other financial information that might reveal its existence. Defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, and Budlong & Barrett, LLC, therefore conspired to conceal evidence of Dr. Murphy's 2002 and 2003 income with the intent to cause harm to the Plaintiff.

97.    Defendant Oberg conspired with defendant Dr. Hiebel to prepare a psychological evaluation specifically because she knew he would be willing to omit and/or fabricate evidence as necessary to support a recommendation of Dr. Murphy for primary custodian of the children, regardless of the true facts, and without concern for the best interests of the children.

98.    As a result of the conspiracy of defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, and Hiebel, Plaintiff has been deprived of meaningful contact with his children, and has suffered damages in an amount to be determined at trial.

**COUNT NINE: OBSTRUCTION OF JUSTICE (Against all defendants)**

99.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 98 as though fully set forth herein.

100.    Defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, and Hiebel corruptly attempted to influence an official proceeding by intentionally concealing documents and relevant information from the Plaintiff and the courts.

101.    As a result of the obstruction of justice of defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, and Hiebel, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT TEN: CONCEALMENT OF EVIDENCE (Against all defendants except Hiebel)**

102.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 101 as though fully set forth herein.

103.    Defendants Oberg and Ford, Oberg, Manion and Houck, PC., Budlong, and Budlong & Barrett, LLC, corruptly concealed the financial records of Dr. Murphy with the intent to impair the records' availability for use in an official proceeding.

104.    As a result of the concealment of evidence by defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, and Budlong & Barrett, LLC, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT ELEVEN: CONCEALMENT OF EVIDENCE (Against Hiebel)**

105.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 104 as though fully set forth herein.

106.    Defendant Hiebel did not produce requested evidence for the purpose of protecting himself, rather than for the purpose of protecting a client as claimed.

107.    Defendant Hiebel corruptly concealed a record or document with the intent to impair the object's integrity or availability for use in an offcial proceeding.

108.    As a result of the concealment of evidence by defendant Hiebel, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT TWELVE: CIVIL RICO (Against all defendants)**

109.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 108 as though fully set forth herein.

110.    Defendants Oberg and Ford, Oberg, Manion and Houck, PC., engaged in racketeering by repeated acts of intentionally concealing material information regarding Dr. Murphy's 2002 and 2003 income tax and other financial information.

111.    Defendants Budlong and Budlong & Barrett, LLC, engaged in racketeering by conspiring with defendants Oberg and Ford, Oberg, Manion and Houck, PC. to intentionally conceal Dr. Murphy's 2002 and 2003 income tax and other financial information. Defendants Budlong and Budlong & Barrett, LLC continued that concealment by ignoring Plaintiff's valid request for production of that information. Defendant Budlong further continued that concealment by objecting to testimony of Dr. Murphy with respect to providing that information, for the purpose of protecting himself rather than his client. Defendant Budlong further engaged in racketeering by forcing plaintiff to settle the appeal without disclosing the missing financial information, by threatening a child support obligation that he knew Plaintiff could not pay.

112.    Defendant Hiebel engaged in racketeering by conspiring with defendant Oberg to fabricate a psychological evaluation that contained knowingly false statements, for the purpose of depriving Plaintiff of material evidence, and continued the concealment of information by failing to adequately comply with a valid request for production of information regarding the creation of his report.

113.    As a result of the racketeering by defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, and Hiebel, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT THIRTEEN: VIOLATION OF 42 U.S.C. SECTION 1983 (Against Hiebel)

114.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 113 as though fully set forth herein.

115.    Defendant Hiebel acted under color of state law in the production of his psychological evaluation of parents Tatum and Murphy, which was a task traditionally delegated to the state.

116.    Defendant Hiebel produced a report that was intentionally biased against the plaintiff, and knew, or should have known, that following the recommendation in his report would result in the separation of the Plaintiff from his children, in violation of Plaintiff's Fifth Amendment right to liberty.

117.    Defendant Hiebel concealed requested evidence with the intent of depriving Plaintiff of a fair and impartial judgment by the court, in violation of Plaintiff's Fourteenth Amendment right to due process.

118.    As a result of the violation of Plaintiff's constitutional rights by defendant Hiebel, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT FOURTEEN: CONSPIRACY TO VIOLATE CIVIL RIGHTS (Against all defendants)**

119.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 118 as though fully set forth herein.

120.    Defendant Hiebel, who was acting under color of state law, conspired with defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, and Budlong & Barrett, LLC, to share the common objective of depriving Plaintiff of critical evidence to insure that the Plaintiff would lose in a trial or custody determination, in violation of Plaintiff's Fourteenth Amendment right to due process.

121.    Defendant Hiebel, who was acting under color of state law, conspired with defendants Oberg and Budlong to share the common objective of depriving Plaintiff of critical evidence to insure that the Plaintiff would be separated from his children, in violation of Plaintiff's Fifth Amendment right to liberty.

122.    As a result of the violation of Plaintiff's constitutional rights by defendant Hiebel, Plaintiff has suffered the loss of significant contact with his children, and has suffered damages in an amount to be determined at trial.

## COUNT FIFTEEN: VIOLATION OF CONNECTICUT CONSTITUTION ARTICLE 1 SECTION 20 (Against all defendants)

123.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 122 as though fully set forth herein.

124.    Defendant Hiebel, who was acting under color of state law, conspired with defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, to deprive Plaintiff Tatum of evidence needed to obtain a fair and impartial hearing, solely because the Plaintiff is of the male gender.

125.    As a result of the violation of Plaintiff's rights under the Connecticut Equal Rights Amendment, Article 1, section 20, by defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, and Hiebel, Plaintiff has suffered the loss of significant contact with his children, and has suffered damages in an amount to be determined at trial.

## COUNT SIXTEEN: WRONGFUL INTERFERENCE WITH PARENTAL RIGHTS (Against all defendants)

126.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 125 as though fully set forth herein.

127.    Defendants Oberg, Ford, Oberg, Manion and Houck, PC., Budlong, Budlong & Barrett, LLC, and Hiebel, who were outside the relationship between parents Tatum and Murphy and the minor children, acted to prevent Plaintiff Tatum from exercising his parental and custodial rights.

128.    As a result of the violation of Plaintiff's parental and custodial rights by defendants

Hiebel, Plaintiff has suffered the loss of significant contact with his children, and has

suffered damages in an amount to be determined at trial.

**CAUSE OF ACTION FOR DECLARATORY RELIEF**

129.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 128 as

though fully set forth herein.

130.    The Child Support Production Incentives Act of 1998, 42 U.S.C. § 658a, ("Incentive

Payments to States") distributes approximately $450 million to states each year according

to five objectives or incentives regarding each state's actions in child custody matters. Four

of the five incentives are dependent upon decisions made by State Courts. The incentives

encourage Courts to decide custody matters based on the financial implications to the

state, and do not mention the best interests of the children. This Act is unconstitutional as

applied.

131.    The second financial incentive of the Act, with regard to the support order

performance level, 42 U.S.C. § 658a(b)(4)(B), requires that child support must be ordered

in at least 50% of cases for a state to receive that portion of the federal incentive payment.

This objective therefore rewards courts for avoiding equal custody decisions, since there is

no justification for entering a child support order if both parents are already equally sharing

custody and household expenses of the children. States must therefore take children away

from one parent to justify the imposition of a child support order. Accordingly, this incentive

violates the right to liberty clause of the Fifth Amendment of the United States Constitution.

It also violates the due process clause of the Fifth Amendment by confidently predicting

that at least 50% of all future cases will have underlying facts to substantiate the imposition

of a child support order.

132.    The third and fourth incentives involve the collection of child support payments (42 U.S.C. § 658a(b)(4)(C) and (D)). The main portion of the incentive payment is calculated as a percentage of the total amount of child support that States collect each year. Child support orders in Connecticut are based on each parent's total income or earning capacity. There are no income caps or other provisions in the Act that require parents' income to be considered in an equitable manner in the calculation of the incentive payment. Therefore, the State can increase its federal incentive payment if the parent with the higher earning capacity is the one who is ordered to pay child support, a conclusion that unfairly presumes parental fitness can be determined by the amount of a parent's income. Accordingly, this bias against the parent with the greater income or earning capacity violates the due process clauses of both the Fifth and Fourteenth Amendments of the United States Constitution. Additionally, and notwithstanding the true facts in this case, fathers typically have greater earning capacities than mothers of minor children, therefore this bias against the parent with the greater income or earning capacity has an adverse impact on the male gender, and thus also violates the due process clauses of both the Fifth and Fourteenth Amendments of the United States Constitution in that manner.

133.    Without declaratory relief from this court, there is a high likelihood that any financial relief awarded to the Plaintiff in this action will be unfairly used against the Plaintiff in subsequent custody decisions.

134.    This Court should therefore declare that 42 U.S.C. § 658a is unconstitutional and enjoin its use in an unconstitutional manner.


**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.      damages in an amount to be proven at trial, along with appropriate interest, costs, and attorney's fees;

B.      punitive damages;

C.      treble damages;

D.      declare that the Child Support Production Incentives Act of 1998 (42 U.S.C. § 658a, "Incentive Payments to States") violates the right to liberty clause and the due process clause of the Fifth Amendment of the United States Constitution by discouraging equal child custody arrangements where child support payments would not be necessary;

E.      declare that the Child Support Production Incentives Act of 1998 violates the due process clause of the Fourteenth Amendment of the United States Constitution, by discriminating against the higher-income parent in child custody decisions, which has an adverse impact on men;

F.      declare that the Child Support Production Incentives Act of 1998 violates the due process clause of the Fourteenth Amendment of the United States Constitution by unjustly influencing custody decisions in a manner that is most profitable to the state, subordinating the actual evidence in a case regarding parental fitness;

G.      other and further relief as the Court deems just and proper.

Dated: July 23, 2008

Plaintiff,
Pro Se

_Gary L. Tatum_

Gary L. Tatum
P.O. Box 3000-70
Georgetown, TX 78626
(512) 879-6522
garytatum@earthlink.net

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the plaintiff in the above action, that he has read the complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at Georgetown, Texas on July 23, 2008.

_____
Plaintiff's Original Signature